UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

RICKEY JAMERSON,                    )
                                    )
            Plaintiff,              )
                                    )
    vs.                             )        Case No. 4:06CV01123 RWS
                                    )
ELAINE L. CHAO,                     )
*Secretary of Labor, U.S. Dept. of Labor,*  )
                                    )
            Defendant.              )

## MEMORANDUM AND ORDER

This matter is before me on Defendant Elaine Chao's Motion for Summary Judgment [#21].

I have reviewed Jamerson's Original Complaint, exhibits to the Original Complaint, and Jamerson's Amended Complaint. Jamerson is pursuing claims initially presented in United States Department of Labor, Bureau of Labor Statistics Cases 03-07-098 and 04-07-001.

Case 03-07-098 presented the issue of whether Jamerson was discriminated against on the bases of his race, color and age, and, further, whether he was subjected to retaliation for participating in prior activity with the Equal Employment Opportunity Commission ("EEOC"), when he was suspended "from duty and pay" for 14 calendar days. Case 04-07-001 presented the issue of whether Jamerson was discriminated against on the bases of his race, color and age, and, further, whether he was subjected to retaliation for participating in prior activity with the EEOC, when he was made aware that his scheduled hours for fiscal year 2004 were reduced.

Jamerson attached a Right to Sue letter from the EEOC to his Original Complaint, giving him the right to sue on Cases 03-07-098 and 04-07-001. Paragraph 1 of the Original Complaint, as well as unnumbered paragraphs 5 through 7 of the attachment to the Original Complaint, refer

to the 14-day suspension. Paragraph 14 of the Amended Complaint refers to the 14-day suspension as being "illegal" and the imposition of the suspension constituting "reprisal for I am a black male who knew the law and blew the whistle."

**Background**

Plaintiff Rickey Jamerson is, and at all times relative to this cause of action has been, employed by the United States Department of Labor, Bureau of Labor Statistics (hereafter "BLS") as an Economic Assistant. Jamerson's duty station is the St. Louis, Missouri Field Office, also known as the St. Louis Primary Sampling Unit ("PSU"). Jamerson's employment as an Economic Assistant is as a permanent part-time employee.

Scheduling of Hours

All Economic Assistants in the PSU are permanent part-time employees. Public Law 94-437, the Federal Employee's Part-Time Career Employment Act of 1978, 5 U.S.C. 3401, et seq., defines "part-time career employment" as "part-time employment of 16 to 32 hours a week . . ." 5 U.S.C. 3401(2). The duties of all Economic Assistants within BLS include the collection of data for inclusion into the Consumer Price Index. Economic Assistants are assigned "Tour of Duty" Calendars. The Tour of Duty Calendars set forth the number of hours which each employee is scheduled to work during the 52 weeks in each particular fiscal year. All Economic Assistants are expected to work on the days and at the times specified in their respective Tour of Duty Calendars.

In calculating Tour of Duty Calendars for Economic Assistants, workload projections for the upcoming fiscal year are sent by the Statistical Methods Division of the Division of Consumer Prices and Price Indexes located in Washington, D.C. The workload projections list the number of "schedules," or data collection assignments which will be assigned to each PSU

during the 12 months in the next fiscal year. The number of schedules to be assigned to each PSU is determined by the Statistical Methods Division of the Division of Consumer Prices and Price Indexes. Neither the St. Louis PSU nor the PSU Field Manager has any input into the number of schedules assigned to the St. Louis PSU for the fiscal year.

The BLS's National Office also assigns a number of hours within which it is determined that a particular type of schedule can be completed. The distribution of schedules for each Economic Assistant in the St. Louis PSU for FY2004 was determined by St. Louis PSU Field Manager John Sukalski. For FY 004, the St. Louis PSU had six Economic Assistants, including Jamerson. Field Manager Sukalski added an additional 10 percent of projected hours into the total number of hours forecast to complete the assigned schedules. The additional 10 percent add-on was designed to account for unforeseen circumstances which might require the need for additional time to complete the schedules.

With the exception of new hires, each Economic Assistant receives the same number of training hours during any particular fiscal year. Training hours are added to the projected total number of hours required to complete the assigned schedules. St. Louis PSU Field Manager Sukalski took the total number of schedules assigned to the St. Louis PSU for FY2004 along with the total number of hours for each such schedule and divided the six Economic Assistants in the PSU. Each Economic Assistant in the St. Louis PSU received the same number of schedules, or work assignments, for FY 2004. Each Economic Assistant was given the same number of hours to complete the same number of schedules assigned to them for FY 2004.

In working out their Tour Of Duty Calendar, Field Manager Sukalski instructs each Economic Assistant to add any planned Annual and Sick Leave into their Tour of Duty Calendar in addition to the hours included from the assigned schedules. On August 15, 2003, Jamerson

and all other Economic Assistants in the St. Louis PSU received an individual memorandum regarding the need to prepare their Tour of Duty Calendars for FY2004. These memorandums was sent to the individual Economic Assistants by Field Manager Sukalski and were identical in their printed format.

Each Economic Assistants in the St. Louis PSU was instructed to schedule 120 hours of duty hours for each on-cycle month; 60 hours for each off-cycle month, and 45 hours of Holiday Leave. Economic Assistant Martha Skaggs was instructed to fill out her FY2004 Tour of Duty Calendar with the same number of hours as every other Economic Assistant in the St. Louis PSU, including Jamerson, with the additional requirement of scheduling 64 additional hours for mandatory *new hire* training. Economic Assistant Martha Skaggs was hired as an Economic Assistant in the St. Louis PSU effective July 2003. Neither Jamerson nor any of the other four Economic Assistants in the St. Louis PSU was instructed to include new hire training because Jamerson and the other four Economic Assistants had received new hire training in previous years.

All Economic Assistants' FY2004 Tour of Duty Calendar, including Jamerson's, was reduced by 24 hours compared to their FY2003 Tour of Duty Calendar. The 24 hour reduction in the FY2004 Tour of Duty Calendars for all economic assistants occurred because the FY2003 Tour of Duty Calendars included 24 hours of Independent Study training classes and no similar training was scheduled for FY2004.

In filling out their individual Tour of Duty Calendars, Economic Assistants may supplement their assigned hours with accrued and projected Annual Leave hours. In addition to the 24 hour reduction in FY 2004 Tour of Duty Calendars, Jamerson's hours of duty for FY2004 included fewer hours than those in his FY2003 Tour of Duty Calendar because Jamerson elected

to schedule 169 hours of Annual Leave in FY2003 but only elected to include 36 hours of Annual Leave for FY2004.

On October 6, 2003, Jamerson filed a formal administrative complaint alleging that the BLS had discriminated against him and had engaged in reprisal against him for prior EEOC activity. On February 3, 2004, the BLS accepted for investigation Jamerson's claim of "whether the [BLS] discriminated against [Jamerson] on the basis of race, color, sex, age, and/or reprisal for previous participation in the EEO process when he received an August 15, 2003, Memorandum with the subject 'FY2004 Tour of Duty' that allegedly reduced [Jamerson's] hours of work." On July 27, 2004, Jamerson filed a Notice of Request for EEOC Hearing and the matter was forwarded to the EEOC St. Louis District Office.

<u>Work Schedules and Rules for Economic Assistants</u>

On February 6, 2001, Assistant Regional Commissioner Hal Corley issued a memorandum for Consumer Price Index Field Managers and Economic Assistants, including Jamerson, entitled "Work Schedules and Rules for CPI Economic Assistants." (hereafter "Corley Memo I"). The Corley Memo I, under the heading "Hours Worked," instructed Economic Assistants that "work in excess of 32 hours must be authorized in advance by your Field Manager." The Corley Memo I instructed Economic Assistants that "it is never permissible to determine independently that it takes more hours to do the job than have been provided and then simply work those hours." The Corley Memo I instructed Economic Assistants that "if you believe the current hours are not sufficient, you must address this directly with your Field Manager rather than working unauthorized hours or returning incomplete work at the end of a pricing period."

On August 6, 2001, Assistant Regional Commissioner Hal Corley issued a Memorandum for Economic Assistants entitled "Tours of Duty." (hereafter, "Corley Memo II"). The Corley Memo II instructed Economic Assistants that "you are expected to work on the days and at the times scheduled on your monthly calendar." The Corley Memo II instructed Economic Assistants that "occasional changes in the arrangement of scheduled hours and days are possible. The switch must be requested in advance and approved by your Field Manager." The Corley Memo II instructed Economic Assistants that "you are expected to work your scheduled hours" and that "'off the clock' work is never permitted." The Corley Memo II instructed Economic Assistants that "you may not decide on your own to work more hours than you are scheduled."

On September 5, 2001, Jamerson and his Field Manager, John Sukalski, had a meeting to discuss various work issues. The topics to be discussed were memorialized in an e-mail of the same date from Field Manager Sukalski to Jamerson. During the September 5, 2001, meeting, Jamerson was reminded by Field Manager Sukalski that it was required that "all Economic Assistants work according to their Tour of Duty Calendar. Any hours worked beyond the Tour of Duty Calendar must be authorized in advance by the field manager. It is never permissible to determine independently that it takes more hours to do the job."

Jamerson's 14-Day Suspension

On September 18, 2001, Jamerson and Field Manager Sukalski had a meeting to discuss a 16 hour carry. The substance of the meeting was memorialized in an e-mail dated September 19, 2001, from Field Manager Sukalski to Jamerson. During the September 18, 2001, meeting, and in the September 19, 2001, e-mail, Jamerson was told, "you did not have prior approval for the 16 hours you have claimed. You now know it is never permissible to determine independently that it takes more hours to do the job than what is scheduled on your tour of duty." During the

September 18, 2001, meeting, Jamerson told Field Manager Sukalski that "the hours to be determined will be determined by an administrative law judge." During the September 18, 2001, meeting, Jamerson also told Field Manager Sukalski that "the hours he has claimed are implied because of the workload he was given."

On September 27, 2001, Field Manager Sukalski sent a Memorandum to Jamerson and attached Jamerson's official Tour of Duty Calendar for FY2002 (hereafter "Sukalski Memo I"). In the Sukalski Memo I, Jamerson was told "You are not to work any hours not scheduled on your calendar without receiving prior permission from me to do so." Jamerson was also told to call Field Manager Sukalski "any time you have questions or concern, and certainly whenever you foresee a need to change your schedule."

On September 28, 2001, CPI Branch Chief Reid Nickisch sent a memorandum to Jamerson entitled "Work Instructions and Requirements" (hereafter, "Nickisch Memo"). In the Nickisch Memo, Jamerson was told, "you must communicate assignment and work schedule status, issues, questions, and problems to your field manager, John Sukalski. . ." Jamerson was again told "you must not work non-authorized hours." Jamerson was told "the Tour of Duty Calendar is your official tour of duty. If you wish to change the hours specified in the calendar, contact your field manager prior to working the hours in question . . . "you are to work on the days and at the times specified on your tour of duty calendar."

On November 20, 2001, Field Manager Sukalski sent a memorandum to Jamerson (hereafter "Sukalski Memo II") regarding various time reporting and travel claim discrepancies, including Jamerson working hours which were not scheduled on Jamerson's Tour of Duty Calendar. In the Sukalski Memo II, Jamerson was told, "you are not allowed to work hours not

scheduled in your Tour of Duty without prior approval."   Jamerson was told "changes to your

Tour of Duty must be authorized by your supervisor prior to working any time outside of your

Tour of Duty hours."

On December 13, 2001, Jamerson was issued by hand delivery an Official Reprimand

in which he was told: "[Y]ou must follow supervisory instructions. You must work the hours

specified in your tour of duty and you must request absences in advance by contacting me. Your

failure to follow instructions is unacceptable and may lead to further disciplinary action up to and

including removal."  On November 6, 2002, Field Manager Sukalski issued to Jamerson a Notice

of a proposed 3-Day Suspension for failure to follow supervisory instructions, which included

five separate instances of Jamerson working hours not scheduled on Jamerson's FY 2002 official

Tour of Duty Calendar without first obtaining supervisory approval. On November 26, 2002,

Jamerson was issued a Notice of Decision to suspend him for 3 calendar days for failure to

follow supervisory instructions as outlined in the November 6, 2002, Notice of Proposed

Suspension.  The Notice of Decision was hand-delivered to Jamerson on December 2, 2002.

On December 2, 2002, Field Manager Sukalski sent an e-mail to Jamerson entitled

"Unauthorized Hours," in which it was stated, "this is to notify you that you were not authorized

to work any of the hours you claimed during the week ending November 30, 2002."  Field

Manager Sukalski told Jamerson, "in the future, you are to work only the hours scheduled in your

tour of duty calendar unless you discuss the situation in advance."

On February 10, 2003, Field Manager Sukalski sent an e-mail to Jamerson in which

Sukalski stated, "this is a reminder. Again, you are not to work any hours other than those on

your current Tour of Duty without my specific prior instruction. You were suspended once for

this action.  Provide me by 2:00 P.M., 2/11/03, why you believe you were entitled to work the

hour you claimed for January 27, 2003 through February 1, 2003. Working outside your Tour of Duty is behavior that is not acceptable." On February 28, 2003, Field Manager Sukalski reminded Jamerson during a meeting that Jamerson must follow his tour of duty.

On March 7, 2003, Field Manager Sukalski sent an e-mail to Jamerson in which it was stated, "Your Tour of Duty indicates you have scheduled yourself (0) hours for the week of March 9, through March 15, 2003, and the week of March 23, through March 29, 2003. You are not authorized to work during those time periods." A copy of the March 7, 2003, e-mail was left by Field Manager Sukalski in Jamerson's working drawer on the same date.

On March 31, 2003, Jamerson was issued a Notice of Proposed 14-Day Suspension for twelve instances of working hours not scheduled on Jamerson's Tour of Duty Calendar without first receiving approval from Field Manager Sukalski. The March 31, 2003, Notice of Proposed Suspension was hand-delivered to Jamerson by Field Manager Sukalski on the same date. Jamerson refused to sign the Notice of Proposed Suspension. Jamerson did not respond either orally or in writing to the Notice of Proposed Suspension.

On April 15, 2003, Jamerson was issued a Notice of Decision to suspend him for 14 calendar days for failure to follow supervisory instructions. The deciding official for the proposed 14-day suspension was then Regional Commissioner Robert A. Gaddie. Commissioner Gaddie reviewed the Proposed Suspension and supporting documentation in making his final decision. In making his decision on the proposed suspension, Commissioner Gaddie considered the history of memoranda, e-mails, and verbal instructions received by Jamerson regarding the requirement that Jamerson work only the hours that were scheduled on Jamerson's Tour of Duty Calendar. He also considered the Official Reprimand that had previously been issued to Jamerson for failure to follow supervisory instruction and the previous 3-day

suspension issued to Jamerson for failure to follow instruction. Commissioner Gaddie considered the fact that despite the facts set forth in paragraphs 78 through 81 above, Jamerson continued to work hours not set forth on his Tour of Duty Calendar.  He also considered Jamerson's work record and longevity with the BLS.  At the time that he made the decision to suspend Jamerson for 14-days, Commissioner Gaddie and Jamerson had never previously met.  Commissioner Gaddie had never previously been the proposing or deciding official for any other Economic Assistant who had worked hours not on that Economic Assistant's Tour of Duty Schedule.

On April 30, 2003, Jamerson filed a formal complaint of discrimination challenging the BLS's decision to impose against Jamerson a 14-day suspension for failure to follow supervisory instructions.  On June 25, 2003, the BLS accepted for investigation Jamerson's claim of "whether or not the [BLS] discriminated against [Jamerson] on the basis of race, color, age and/or reprisal for previous participation in the EEO process when [Jamerson was] suspended from duty for 14 calendar days effective April 21, 2003."

On July 30, 2004, Jamerson filed a Notice of Request for EEOC Hearing and the matter was forwarded to the EEOC St. Louis District Office.  On June 21, 2005, EEOC Administrative Judge Lloyd Vasquez, Jr., issued a Decision on the parties' respective Motions For Summary Judgment in both BLS Case Nos. 03-07-098 (Reduction in FY2004 Tour of Duty Hours) and 04-07-001 (14 Day Suspension).  Judge Vasquez's Decision held "in favor of the BLS and against [Jamerson] on each and all of [Jamerson's] claims at issue herein.

On August 4, 2005, the BLS issued a final action implementing Judge Vasquez's finding of no discrimination. The EEOC accepted Jamerson's Notice of Appeal of the BLS's final order and subsequently issued a Decision on February 9, 2006. The EEOC affirmed "the

agency's final order implementing the [Administrative Judge's] finding of no discrimination, because . . . a preponderance of the evidence does not establish that discrimination occurred."

Jamerson filed a timely Request For Reconsideration of the Commission's Decision. The Commission denied Jamerson's Request For Reconsideration on April 19, 2006. On April 19, 2006, the EEOC issued to Jamerson a Right To Sue Letter regarding the denial of BLS Case Nos. 03-07-098 and 04-07-001. Jamerson filed the instant action on July 24, 2006.

**Standard of Review**

In considering whether to grant summary judgment, a district court examines the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any ...." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Lynn v. Deaconess Medical Center, 160 F.3d 484, 486 (8th Cir. 1998)(citing Fed. R. Civ. P. 56(c)).

The party seeking summary judgment bears the initial responsibility of informing the court of the basis of its motion and identifying those portions of the affidavits, pleadings, depositions, answers to interrogatories, and admissions on file which it believes demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Citrate, 477 U.S. 317, 323 (1986). When such a motion is made and supported by the movant, the nonmoving party may not rest on his pleadings but must produce sufficient evidence to support the existence of the essential elements of his case on which he bears the burden of proof. Id. at 324. In resisting a properly supported motion for summary judgment, the plaintiff has an affirmative burden to designate

specific facts creating a triable controversy.  <u>Crossley v. Georgia-Pacific Corp.</u>, 355 F.3d 1112, 1113 (8th Cir. 2004).

**<u>Analysis</u>**

<u>*Jamerson's Claim Regarding His 2003 Reduction in Tour of Duty Hours is Denied*</u>

While not at issue in Cases 03-07-098 and 04-07-001, Jamerson's Reply to Defendant's Motion For Summary Judgment seeks to resurrect the issue of the reduction in his 2003 scheduled Tour of Duty hours which was the focus of BLS Case No. 03-07-009.  Case No. 03-07-009 was tried before EEOC Administrative Judge Amy Weinhaus in February 2004. Following the presentation of Jamerson's evidence, and after a discussion with Judge Weinhaus, Jamerson voluntarily withdrew his claim regarding the reduced 2003 Tour of Duty Hours. Having reviewed the exchange from the trial transcript, I find that Jamerson's withdrawal of his claim was clearly voluntary and knowing.

In his Reply, Jamerson now claims that Judge Weinhaus "essentially invited me to withdraw the case and claim that it was voluntary," and that Judge Weinhaus "[i]n essence took away my right to an appeal on the issue of the involuntary reduction in hours which is a clear violation of the part-time labor law."  The BLS subsequently adopted Judge Weinhaus' Findings of Fact and Conclusions of Law into a Final Decision on October 19, 2004.  Jamerson appealed the BLS's Final Action to the EEOC as it pertained to the issues which were not withdrawn at the hearing, but Jamerson did not appeal his alleged involuntary withdrawal of the reduction of his 2003 Tour of Duty hours.  The EEOC denied Jamerson's appeal on April 7, 2005.  <u>Jamerson v. Chao</u>, 205 WL 871268 (E.E.O.C.) (April 7, 2005).  Jamerson filed a Motion For Reconsideration which the EEOC subsequently denied on June 7, 2005.  <u>Jamerson v. Chao</u>, 2005 W.L. 1420692 (E.E.O.C.) (June 7, 2005). Again, the issue of the withdrawn claim was not presented.  Although

in both decisions the EEOC notified Jamerson of his right to file a civil action in an appropriate

United States District Court, Jamerson elected not to do so.

Jamerson's failure to explicitly appeal to the EEOC his withdrawal of the claim regarding

the reduction in his 2003 Tour of Duty hours prohibits him from now attempting to resurrect the

issue in this completely unrelated proceeding. "A Title VII plaintiff must exhaust administrative

remedies before bringing suit in federal court." Conttrill v. MFA, Inc., 443 F.3d 629, 634 (8th

Cir. 2006). The 2003 Tour of Duty hours issue was never a part of the EEOC investigation of the

two issues currently before this court. Additionally, unlike the current issues, Jamerson did not

file an action in district court with in 90 days regarding the 2003 Tour of Duty issue. Jamerson's

claim regarding any matter arising out of a prior EEOC investigation which was not fully pursued

cannot therefore be "piggy-backed" onto the issues raised in subsequent EEOC filings. See

Hallgren v. U.S. Dept. of Energy, 331 F.3d 588, 589-90 (8th Cir. 2003) (complaint filed more

than 90 days after receipt of final decision from EEOC is untimely).

*Jamerson Fails to Establish a Claim of Discrimination as a Result of*

*the Reduction in His FY2004 Tour of Duty Hours*

Defendant argues that Jamerson has not presented a *prima facie* case of discrimination

with respect to BLS' reduction in Jamerson's FY2004 Tour of Duty hours.

Under the burden-shifting method of proof articulated by the Supreme Court in

McDonnell Douglas v. Greene, 411 U.S. 792 (1973), a plaintiff in a discrimination case must

first make out a *prima facie* case. In order to prove a *prima facie* case of discrimination, the

plaintiff must prove that (1) he is a member of a protected class; (2) that he met his employer's

legitimate expectations; (3) that he suffered an adverse employment action; and (4) that similarly

situated employees who were not members of the protected class were treated differently.

<u>Higgins v. Gonzales</u>, 481 F.3d 578, 584 (8th Cir. 2006). An "adverse employment action" is one that produces a "material employment disadvantage." <u>Kerns v. Capital Graphics, Inc.</u>, 178 F.3d 764, 767 (8th Cir. 2005).

If the plaintiff can establish a *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for taking the challenged actions. <u>McDonnell Douglas</u>, 411 U.S. at 802-803. If the employer articulates such a reason, then the burden shifts back to the plaintiff to show that the employer's proffered reason is but a pretext for the prohibited discrimination. <u>Buettner v. Arch Coal Sales Co.</u>, 213 F.3d 707, 713 (8th Cir. 2000). In an employment discrimination case, a plaintiff must produce "sufficient evidence to raise a genuine issue of material fact as to whether the employer's proffered reasons were not its true reasons for the challenged employment action" in order to survive a motion for summary judgment. <u>See</u> <u>Sheridan v. E.I. DuPont de Nemours & Co.</u>, 100 F.3d 1061 (3rd Cir. 1996).

Jamerson is an Economic Assistant whose job it is to gather pricing information from various sources about consumer goods, services, and housing. Economic Assistants are part-time employees covered under the Federal Part-Time Career Employment Act of 1978, Public Law 94-437, 5 U.S.C.A. 3401. Under the Part-Time Career Employment Act, part-time employees work regular schedules of 16-32 hours per week. 5 U.S.C.A. 3401(2).

Jamerson's duty station is the St. Louis Primary Sampling Unit ("PSU"). The data collected by Economic Assistants is forwarded to the BLS' National Office where it is compiled into the Consumer Price Index ("CPI"). Economic Assistants assignments are known as "schedules." A schedule is a work assignment pertaining to the collection of data for a particular market basket item which makes up a part of the CPI.

Jamerson satisfies the first and second prongs necessary to establish a *prima facie* case regarding the 2004 reduction in hours. Jamerson is an African-American and therefore is a member of a protected class. Logan v. Denny's, Inc., 259 F.3d 558, 567 (6th Cir. 2001). Jamerson was performing his duties as an Economic Assistant on August 15, 2003, when the memorandum was sent out to all of the Economic Assistants in the St. Louis PSU addressing FY2004 Tour of Duty hours.

Jamerson is unable to satisfy the third prong of the discrimination test. Defendant maintains that the minimal 24-hour reduction in duty hours between FY2003 and FY2004 does not constitute an adverse employment action. The Eighth Circuit has defined an "adverse employment action" as "a tangible change in working conditions that produces a material employment disadvantage." Gagnon v. Sprint Corp., 284 F.3d 839, 850 (8th Cir. 2000)(emphasis added) (quoting Spears v. MO Dept. of Corr. & Human Resources, 210 F.3d 850, 853 (8th Cir. 2000)). The adverse action must produce a "material employment disadvantage." Kerns, 178 F.3d at 1011. Minor changes in working conditions which do not result in a materially significant disadvantage do not satisfy the third prong. Baucom v. Holiday Cos., 428 F.3d 764, 767 (8th Cir. 2005); see also Sikko v. Kassab, Archbold & O'Brian, LLP. 200 WL 307247 (E.D.Pa. 2000)("not everything that makes an employee unhappy constitutes an adverse employment decision").

Here, Jamerson's scheduled Tour of Duty was reduced by 24 hours. This 24 hour reduction was caused by the BLS' decision to not include 24 hours of self-taught training that had been scheduled for 2003. Jamerson does not allege that the BLS must offer a certain number of training hours per year. The 24 hour reduction in hours does not rise to the level of an adverse employment decision because it does not produce a material employment disadvantage.

Even assuming that a 24 hour reduction in scheduled hours could be considered an adverse employment action, Jamerson is still unable to satisfy the fourth prong of McDonnell Douglas. Jamerson must show that other similarly situated, non-protected Economic Assistants in the St. Louis PSU were treated differently than he was. Jamerson must offer some evidence that the Economic Assistants who are not in a protected class or who had not participated in the EEO process did not receive the same 24 hour reduction in their 2004 Tour of Duty Calendars. In 2004, the St. Louis PSU had six Economic Assistants. In addition to Jamerson, an African-American, there were two Caucasians, one Asian American, and one Native American. Jamerson cannot show that any of the other Economic Assistants, regardless of race or color, was treated any differently. The reduction in Jamerson's 2004 hours was identical to the hour reduction experienced by *all* Economic Assistants in the St. Louis PSU office.

Jamerson's 2004 Tour of Duty Hours were also reduced to 133 hours fewer than his 2003 Tour of Duty hours due to no action on the BLS' part. As set forth in the Declaration of Robert Gaddie, Jamerson's supervisor, the number of schedules assigned to the St. Louis PSU, and consequently the number of hours to complete the work, were distributed among all Economic Assistants equally by dividing the total number of schedules by the total number of Economic Assistants. Moreover, the number of schedules assigned to St. Louis was determined by the Statistical Methods Division of the BLS' Division of Consumer Prices and Price Indexes. The Statistical Methods Division is independent of the field offices of which St. Louis is a part. Neither the St. Louis PSU or Field Manager Sukalski, who was the sole decision maker in assigning hours, had any input into the number of schedules which were assigned to the PSU.

While each Economic Assistant was allotted the same number of hours from the schedules which the St. Louis PSU was given, Jamerson did have fewer overall hours scheduled

in FY2004 than in the previous year. The reason for this was not based upon any BLS action. Jamerson had fewer total hours scheduled in 2004 because of the amount of Annual Leave hours he scheduled for himself during the that year. In addition to the hours that Field Manager Sukalski assigned to Jamerson, Jamerson scheduled himself for 169 hours of annual leave in his 2003 Tour of Duty and only 36 annual leave hours in 2004. Jamerson's personal decision to schedule less annual leave hours in 2004 is not his employer's decision, adverse or otherwise.

Jamerson responds that he has "clearly present[ed] a valid case of the third prong of the discrimination test" is unsupported by any evidence. Jamerson has not appended any supporting affidavits or evidence to either his reply to Defendants' or his own Motions For Summary Judgment. Jamerson's rhetoric regarding "administrative judges who make subjective decisions based on the color of a homogenous management team" are unsubstantiated claims which cannot form the basis for denying Defendants' Motion. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S.Ct. 2505 (1986) (A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial).

I find that Jamerson has not presented a *prima facie* case of discrimination with respect to BLS' reduction in Jamerson's FY2004 Tour of Duty hours. I will grant summary judgment in favor of Defendant on Jamerson's discrimination claim.

### *Jamerson Fails to Establish a Claim of Retaliation as a Result of the Reduction in His FY2004 Tour of Duty Hours*

Defendant argues that Jamerson has not presented a *prima facie* case of retaliation with respect to BLS' reduction in Jamerson's FY2004 Tour of Duty hours.

In order to show that an unfavorable job action is based upon an illegal retaliatory motive, Jamerson must establish that: (1) he was engaged in protected activity; (2) a reasonable employee would have found the challenged retaliatory action materially adverse; and (3) the materially adverse action was causally linked to the protected conduct. Higgins v. Gonzales, 481 F.3d 578, 589 (8rd Cir. 2007).

Jamerson is entitled to file EEOC complaints alleging discrimination and therefore meets the first prong of the Higgins test. However, the uncontested facts clearly establish that Jamerson cannot prove the remaining two prongs of the Higgins test. All Economic Assistants in the St. Louis PSU were equally affected by the 24 hour reduction in 2004. Also, as discussed above, the reduction in hours does not rise to the level of being materially adverse.

As the Supreme Court stated in Burlington Northern & Santa Fe Railway Co. v. White, 126 S.Ct. 2405 (2006), "the challenged action [must be] materially adverse, which in th[e] context [of a retaliation claim] means that it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 2415. This standard is objective and requires the court to consider whether a reasonable employee in the Jamerson's position might have been dissuaded from making a discrimination claim because of the employer's retaliatory action. Higgins, 481 F.3d at 589 (quoting Burlington Northern, 126 S.Ct. at 2412-2415). The 24 hour reduction equates to a reduction of less than one full hour for every two week pay period in a year. Moreover, Economic Assistants could supplement the 24 hour reduction with the use of annual leave. The 24 hour reduction does not rise to the level of being materially adverse.

Additionally, the 24 hour reduction in assigned hours for 2004 cannot be said to be causally linked to Jamerson's prior EEOC activity. Field Manager John Sukalski was the only BLS official involved in the decision to reduce Jamerson's and all other Economic Assistants'

2004 hours. Sukalski did not receive any instructions from any superior or peer to take Jamerson's EEOC activity into consideration when preparing the Tour of Duty Calendars. While Jamerson had previously made Sukalski aware of his prior EEOC case, Sukalski did not take such activity into account.

There is simply no evidence to suggest a link between Jamerson's prior activity and the decision to reduce all Economic Assistants' 2004 hours. Moreover, the decision to reduce the 2004 Tour of Duty by 24 hours was not made by the St. Louis PSU. The St. Louis PSU was only responsible for distributing the allocated 2004 Tour of Duty hours. Jamerson did not identify any evidence that the decision to not repeat the 2003 training was made with any consideration of Jamerson, much less with any consideration given to Jamerson's prior EEOC filings. Therefore, Jamerson cannot show that the universal reduction in hours was applied unevenly or was intended to target him specifically. While all inferences must be drawn in favor of the nonmoving party on a motion for summary judgment, "mere speculation and conjecture is insufficient to preclude the granting of the motion." Harlen Assoc. v. Incorp. Village of Mineola, 273 F.3d 494, 499 (2nd Cir. 2001).

Jamerson's Response regarding his failure to present a *prima facie* case of retaliation is based upon unsubstantiated allegations. Jamerson also attempts to raise issues of Family Medical Leave Act ("FMLA") eligibility when in fact no such issue was pleaded nor is such an issue before me. Moreover, whether or not Jamerson or any other similarly situated employee in his work unit is FMLA eligible was never an issue raised in any administratively filed complaint.

I find that Jamerson has not presented a *prima facie* case of retaliation with respect to BLS' reduction in Jamerson's FY2004 Tour of Duty hours. I will grant summary judgment in favor of Defendant on Jamerson's retaliation claim.

*Jamerson Fails to Establish a Claim of Discrimination as a Result of*

*His 14 Day Suspension*

Defendant argues that Jamerson has not presented a *prima facie* case of discrimination with respect to BLS' 14 day suspension of Jamerson. Defendant argues that the basis for the imposition of Jamerson's 14 day suspension was Jamerson's repeated routine ignoring of his supervisor's instructions and Jamerson's working additional hours beyond those scheduled. Management repeatedly told Jamerson that he could not work additional hours without prior approval from his Supervisor.

Jamerson satisfies the first and third prongs of <u>McDonnell Douglas</u> for establishing a *prima facie* case of discrimination. Jamerson is an African-American and therefore is a member of a protected class. <u>Logan v. Denny's, Inc.</u>, 259 F.3d 558, 567 (6th Cir. 2001). Defendant concedes that a 14 day suspension is an adverse employment action. However, Jamerson has offered no evidence that he was performing his job as required or that similarly situated non-protected employees were treated more favorably than he was.

Economic Assistants have their work hours scheduled on an official Tour of Duty Calendar. Communications between BLS management and all Economic Assistants show that as early as February 2001, Economic Assistants were instructed on the work schedules and rules. Corley Memo I states that "it is never permissible to determine independently that it takes more hours to do the job than have been provided and then simply work those hours." It also instructed Economic Assistants that "if you believe the current hours are not sufficient, you must address this directly with your Field Manager rather than working unauthorized hours or returning incomplete work a the end of the pricing period."

An August 6, 2001, Corley Memo II was also distributed to all Economic Assistants. Corley Memo II, captioned "Tours of Duty," states that "you are expected to work on the days and at the times scheduled on your monthly calendar." Corley Memo II reiterated that "you may not decide on your own to work more hours than you are scheduled." It also provides that "occasional changes in the arrangement of scheduled hours and days are possible. The switch must be scheduled in advance and approved by your Field Manager."

Jamerson was told on numerous occasions by Field Manager Sukalski that the Tour of Duty schedule must be followed. On September 5, 2001, Sukalski met with and told Jamerson that "all Economic Assistants [must] work according to their Tour of Duty Calendar" and "any hours worked beyond the Tour of Duty Calendar must be authorized in advance by the Field Manager." On September 18, 2001, Sukalski and Jamerson met to discuss additional hours that Jamerson had claimed to have worked. Sukalski told Jamerson that "it is never permissible for [you] to independently determine that it takes more hours to complete [your] job than what is scheduled on [your] Tour of Duty Calendar." Sukalski summarized the meeting in a September 19, 2001, e-mail which was sent to Jamerson. The e-mail told Jamerson that, "you did not have prior approval for the 16 hours that you have claimed. *You now know it is never permissible to determine independently that it takes more hours to do the job than what is scheduled on your tour of duty*."(emphasis added)   Jamerson's reply during the meeting was that "the hours to be determined will be determined by an [EEOC] administrative law judge," and that "the hours claimed are implied because of the workload."

When Jamerson was given his 2002 Tour of Duty Calendar, Sukalski attached a memorandum, "Sukalski Memo I, which told Jamerson that "[y]ou are not to work any hours not scheduled on your calendar without receiving prior permission from me." On September 28,

2001, CPI Branch Manager Reid Nickisch sent a memorandum to Jamerson entitled "Work Instructions and Requirements." The Nickisch Memo instructed Jamerson that "you must communicate assignment and work schedule status, issues, questions and problems to your field manager." The Nickisch Memo also tells Jamerson that "you may not work non-authorized hours;" that "If you wish to change the hours specified in the calendar, contact your field manager prior to working the hours in question" and "you are to work on the days and at the times specified on your tour of duty calendar."

On November 20, 2001, Sukalski sent another memorandum to Jamerson. Sukalski Memo II dealt with various issues including Jamerson working hours for which he was not scheduled. In Sukalski Memo II, Jamerson was again told that "you are not allowed to work hours not scheduled in your Tour of Duty without prior approval," and "changes to your Tour of Duty must be authorized by your supervisor prior to working any time outside of your Tour of Duty hours."

Jamerson was also warned against continuing to work additional unscheduled hours in an Official Reprimand. The Reprimand states that "you must follow supervisory instructions. You must work the hours specified in your tour of duty . . . . Your failure to follow instructions is unacceptable and may lead to further disciplinary action up to and including removal." On November 6, 2001, Jamerson was issued a Notice of Proposed 3-day suspension which included five separate instances of working beyond the hours specified on his Tour of Duty Calendar. A Notice of Decision to suspend Jamerson for 3 days for failure to follow supervisory instructions was issued on November 26, 2001.

During his deposition, Jamerson admitted that he was well aware that he was not allowed to work outside of his official Tour of Duty without first obtaining supervisory approval.

However, Jamerson continued to work hours for which he was not scheduled without first obtaining his supervisor's approval.

On March 31, 2003, Jamerson was issued a Notice of Proposed 14-Day Suspension for twelve instances of working hours not scheduled on Jamerson's Tour of Duty Calendar without first receiving approval from Field Manager Sukalski. The March 31, 2003, Notice of Proposed Suspension was hand-delivered to Jamerson by Field Manager Sukalski on the same date. Jamerson refused to sign the Notice of Proposed Suspension. Jamerson did not respond either orally or in writing to the Notice of Proposed Suspension. On April 15, 2003, Jamerson was issued a Notice of Decision to suspend him for 14 calendar days for failure to follow supervisory instructions.

Jamerson has not proven that he was performing his job according to his employer's legitimate expectations, as required under the second prong of McDonnell Douglas. Therefore, I find that Jamerson's claim of discrimination fails.

Additionally, Jamerson has failed to establish the fourth prong of McDonnell Douglas. In order to satisfy this element, Jamerson must show that Economic Assistants in the St. Louis PSU who are not protected class members were allowed to work outside of their Tour of Duty and either asked for and were granted permission to do so or did not ask for prior approval and were nevertheless not disciplined for such behavior. However, as both the proposing and deciding officials' Declarations show, Jamerson cannot establish that any Economic Assistants were treated differently than Jamerson. Field Manager Sukalski's Declaration provides, "I have no direct knowledge that Economic Assistants other than Rickey Jamerson worked outside their official Tour of Duty Calendar;" "[n]o Economic Assistants other than Rickey Jamerson ever claimed on their time reports any hours worked outside of those hours officially approved on

their respective Tour of Duty Calendars;"and, "During my time as Field Supervisor at the St. Louis PSU, I did not need to speak with, counsel nor reprimand any Economic Assistant other than Rickey Jamerson for working hours not approved on their Tour of Duty Calendars." Similarly, Robert Gaddie's Declaration states, "I have no knowledge of any other Economic Assistant engaging in the type of behavior for which Rickey Jamerson was suspended."

Jamerson's reply regarding his 14-day suspension for failure to follow supervisory instructions consists of unsubstantiated allegations. Jamerson fails to address the numerous verbal and written instructions, including a letter of reprimand and prior 3-day suspension for identical behavior, which the BLS documented and attached to its Motion For Summary Judgment and which clearly prohibited Jamerson from working unscheduled hours without first obtaining supervisory approval. Indeed, the most telling evidence that the BLS's decision to suspend Jamerson was not based upon any improper discriminatory motivation is reflected in Jamerson's Response wherein he states, "If I had the work to do then I did it."

I find that Jamerson has not presented a *prima facie case* of discrimination with respect to BLS' 14 day suspension of Jamerson. I will grant summary judgment in favor of Defendant on Jamerson's discrimination claim.

### *Jamerson Fails to Establish a Claim of Retaliation as a Result of His 14 Day Suspension*

Defendant argues that Jamerson has not presented a *prima facie* case of retaliation with respect to BLS' 14 day suspension of Jamerson. Defendant argues that Jamerson cannot provide any evidence to remotely suggest that there exists a causal link between the decision to suspend Jamerson and Jamerson's prior EEOC activities. Higgins, 481 F.3d 589.

It is undisputed that the BLS does not allow Economic Assistants to independently determine when they will work. The BLS requires that each Economic Assistant adhere to their

official Tour of Duty Calendar and Jamerson was repeatedly reminded, verbally, in writing, with a Reprimand, and with a prior 3-day suspension, of this fact. Jamerson has not provided any evidence that this policy was not invoked with others or that the application of this policy as to him specifically was but a pretext for retaliation.

I find that Jamerson has not presented a *prima facie case* of retaliation with respect to BLS' 14 day suspension of Jamerson. I will grant summary judgment in favor of Defendant on Jamerson's retaliation claim.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Elaine Chao's Motion for Summary Judgment [#21] is **GRANTED**.

_____
RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this 20th day of February, 2008.